## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| BONNIE DIXON-TRIBOU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:20-cv-00379-NT |
| | ) |
| DENIS MCDONOUGH, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

Before me are the Plaintiff's motion for partial summary judgment[1] ("**Pl.'s Mot.**") (ECF No. 64) and the Defendant's motion for summary judgment ("**Def.'s Mot.**") (ECF No. 61). For the reasons stated below, the Plaintiff's motion is **DENIED**, and the Defendant's motion is **GRANTED**.

## FACTUAL BACKGROUND[2]

The Plaintiff, Bonnie Dixon-Tribou, began working for the U.S. Department of Veterans Affairs (the "**VA**") at the Togus VA Medical Center ("**Togus**") in 2006 as a

---

[1]      Though styled as a "Motion for Summary Judgment," Pl.'s Mem. in Supp. of Mot. for Summ. J. 1 (ECF No. 64), as the Plaintiff acknowledged at the Local Rule 56(h) Pre-Filing Conference (the "**56(h) Conference**"), her motion is really a motion for partial summary judgment, limited to the issue of liability, Local Rule 56(h) Pre-Filing Conference Tr. 3:17–19 (ECF No. 50). Even if I were to grant the Plaintiff's motion in its entirety, the issue of damages would remain.

[2]      The following background is drawn from: (1) the Defendant's statement of material facts and the Plaintiff's responses ("**DSOF**") (ECF No. 75); (2) the Plaintiff's statement of material facts and the Defendant's responses, as well as the additional statement of material facts filed by the Defendant ("**PSOF**") (ECF No. 73); and (3) directly from documents in the summary judgment record, which is found at ECF Nos. 55–57, 72, and 79 (the "**Record**"). I note that in analyzing the Defendant's motion I have only considered the DSOF (including the Plaintiff's responses), and in analyzing the Plaintiff's motion I have only considered the PSOF (including the Defendant's responses and additional statement of facts). But because the issues in these two motions significantly overlap, I consider these two motions in conjunction with one another.

As to the Plaintiff's motion, despite the requirements of Local Rule 56(c) and my Local Rule 56(h) Pre-Filing Conference Report and Order ("**56(h) Order**"), the Plaintiff failed to file a response to the additional facts that the Defendant submitted when it responded to the Plaintiff's motion. *See* D. Me. Loc. R. 56(c); 56(h) Order ¶ 6 (ECF No. 49). Pursuant to the Local Rules, parties must support or oppose any statements of material fact with citations to the record. D. Me. Loc. R. 56(f). Facts that are not opposed are deemed admitted. D. Me. Loc. R. 56(f); *see Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007) ("In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a [local] rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated."). Because the Plaintiff has failed to file any response, the Defendant's additional facts are all deemed admitted for purposes of the Plaintiff's motion. In addition, the Defendant requests to strike a number of the Plaintiff's statements of fact because the Plaintiff fails to support them—either fully or partially—with citations to the record, in violation of Local Rule 56(f). *See* PSOF ¶¶ 2, 6, 13, 14, 21, 23, 25, 32, 38, 44, 46–48, 50–55, 57. Although many of these facts do not factor into my analysis, I agree that they are unsupported, and the Defendant's requests to strike these facts are granted.

As to the Defendant's motion, as a precursor to her responses to the DSOF, the Plaintiff makes a vague, general request to strike "inadmissible factual assertions, including general background information and matters otherwise irrelevant to this case." Pl.'s Resp. and Evidentiary Objs. to Def.'s Statement of Material Facts in Supp. of His Mot. for Summ. J. ("**Pl.'s Resp. to DSOF**") 1 (ECF No. 75); *see also* Pl.'s Resp. to DSOF 3 (requesting to strike "all other of Defendant's Statements of Material Fact relating to Plaintiff's disability"). These vague, general requests to strike are improperly made and will not be entertained. *See* D. Me. Loc. R. 56(e) ("If a party contends that an individual statement of fact should not be considered by the court, the party may include as part of the response that the statement of fact 'should be stricken' with a brief statement of the reason(s) and the authority or record citation in support."). Moreover, the Plaintiff improperly denies DSOF ¶¶ 5, 8, 9, 11, 12, 19, 31, 37, 42–45, 49, 50, 52–54, 56, 57, 69–71, 74–76, 78–87, 89, 90, 92, 95, 98, 102, and 103 by failing to offer any record citation to support her denials. Facts that are improperly controverted in this manner are deemed admitted. There are various statements of fact in the DSOF that the Plaintiff purports to deny, but rather than provide a genuine denial, she merely qualifies the statement of fact.  I treat these facts—DSOF ¶¶ 27, 32, 36, 41, 60, 73, and 99—as admitted, subject to the Plaintiff's supported qualifications, for purposes of the Defendant's motion. Similarly, the Plaintiff responds to some of the DSOF with a "Denied/Qualified" response. *See* DSOF ¶¶ 24, 34, 46, 59, 64, 65, 67, 68, 100. I construe these as qualifications rather than denials unless otherwise noted, and DSOF ¶¶ 24, 34, 46, 59, 64, 65, 67, 68, and 100 are admitted for purposes of the Defendant's motion, subject to the Plaintiff's qualifications. The only statements of fact that the Plaintiff properly requests to strike are DSOF ¶¶ 49 and 63. As I understand her argument, the Plaintiff requests to strike these facts because they "ask[ ] the Court to review and consider facts related to OPM's final and conclusive decision on disability" and they are therefore irrelevant. DSOF ¶ 49; *accord* DSOF ¶ 63. This appears to relate to the Plaintiff's jurisdictional argument, which I consider to be legally flawed. Because I ultimately reject the Plaintiff's jurisdictional argument, which I explain more thoroughly below, and because I conclude that DSOF ¶¶ 49 and 63 are relevant, I deny these requests to strike. The Plaintiff also argues that DSOF ¶¶ 4 and 22—which both relate to whether the Plaintiff had a formal approved reasonable accommodation—are irrelevant. DSOF ¶¶ 4, 22. The Plaintiff does not request to strike these statements, but even if she had, I would deny such a request as I find that these facts are relevant.

floor nurse. Pl.'s Resp. and Evidentiary Objs. to Def.'s Statement of Material Facts in Supp. of His Mot. for Summ. J. ("**DSOF**") ¶ 1 (ECF No. 75); Def.'s Opposing Statement of Undisputed Material Facts and Additional Statement of Undisputed Material Facts ("**PSOF**") ¶ 1 (ECF No. 73). The VA system categorizes its nurses into five pay grades: Nurse I, Nurse II, Nurse III, Nurse IV, and Nurse V. DSOF ¶ 5. Only certain positions are eligible to be promoted to Nurse IV or Nurse V, and those promotions are only available if the scope and complexity of the position is comparable to the scope and complexity of a VA facility's Nurse Executive. DSOF ¶ 7. That is, unlike the Nurse I, II, or III categories, where promotions are based on an employee's individual qualifications, promotions to Nurse IV (or V) are position-specific, based on the scope and complexity of the particular position. DOSF ¶¶ 6–7. As of 2014, there were only approximately five Nurse IV positions at Togus. DSOF ¶ 8.

As of February 2014, Ms. Dixon-Tribou was a Nurse III. DSOF ¶ 10. The Chief Nurse Executive reviewed Ms. Dixon-Tribou's position for promotion to a Nurse IV position and, after concluding that Ms. Dixon-Tribou's role did not have the requisite scope and complexity for promotion to Nurse IV, did not recommend her for a promotion. DSOF ¶¶ 11–12. Ms. Dixon-Tribou did not learn that she was passed over for this promotion until December of 2016. DSOF ¶ 105.

## I.   The Accommodations the VA Made for Ms. Dixon-Tribou's Disability, and Ms. Dixon-Tribou's Disciplinary Record

In approximately late 2014, Ms. Dixon-Tribou began working in Togus's Non-VA Care Unit (later renamed the Community Care Department). Dep. of Bonnie C. Dixon-Tribou ("**Pl.'s Dep.**") 42:9–12; 46:2–47:3 (ECF No. 55-1); DSOF ¶ 17; PSOF

¶ 58. Once she began this position, Ms. Dixon-Tribou moved physical office spaces to a small room ("**Room 216**") without air conditioning or windows. DSOF ¶¶ 21, 32; PSOF ¶ 60. Within a few weeks of moving to Room 216, Ms. Dixon-Tribou began to have issues with the temperature in her office space. DSOF ¶ 24; PSOF ¶¶ 24, 62. This was because of her multiple sclerosis ("**MS**"), which causes her to be sensitive to high temperatures. June 26, 2015, Letter from Dr. Paul Muscat ("**Muscat Letter**") (ECF No. 55-14, PageID # 1320).

On July 8, 2015, Ms. Dixon-Tribou emailed Dustin Cochran, the Reasonable Accommodation Coordinator for Togus, to complain about the temperature in her office, and she proposed three potential solutions—that she be given an air conditioner, that she be given a laptop so that she could "travel to reasonable temperatures," or that she be permitted to telework. DSOF ¶ 25; PSOF ¶ 62; July 8, 2015, Email from Bonnie Dixon-Tribou (ECF No. 55-14, PageID # 1200). Mr. Cochran responded that same day by explaining the process for requesting a reasonable accommodation. July 8, 2015, Email from Dustin Cochran (ECF No. 55-14, PageID # 1199).[3] In response, Ms. Dixon-Tribou provided Mr. Cochran with a letter from her doctor, Dr. Paul Muscat, explaining that, due to her MS, Ms. Dixon-Tribou was "very sensitive to even moderately elevated temperatures" and thus needed "a work environment in which higher temperature is not a problem." DSOF ¶ 27; PSOF ¶ 63;

---

[3]    In response to DSOF ¶26, the Plaintiff contends that Mr. Cochran provided a "false" description of the reasonable accommodation process because he "misinformed" her that a reasonable accommodation must be requested in writing. DSOF ¶ 26. The Plaintiff's claim is contradicted by the part of the Record that she cites. In the email from Dustin Cochran, he explicitly told Ms. Dixon-Tribou that the written request was "voluntary" but was "helpful." July 8, 2015, Email from Dustin Cochran (ECF No. 55-14, PageID # 1199).

Muscat Letter. Dr. Muscat did not recommend a specific accommodation but rather asked the VA to "make every effort to accommodate this requirement in any way that [it saw] fit." DSOF ¶ 27; PSOF ¶ 63; Muscat Letter.

On July 20, 2015, the VA issued an "Approval of Accommodation Request" outlining a plan to move Ms. Dixon-Tribou from Room 216 to a new office space—Room 218E—and to supply her with a window or standalone air conditioning unit to keep the temperature in her office below seventy-two degrees. DSOF ¶ 32; PSOF ¶ 64. This plan was put into action a couple of weeks later. DSOF ¶ 35; PSOF ¶ 65.

At some point in the fall of 2015, Ms. Dixon-Tribou began to complain about how her coworkers treated her and that they would harass and bully her. DSOF ¶ 41. She also raised concerns that she was unable to control the temperature in Room 218E due to personality conflicts with her officemates. DSOF ¶ 36. In particular, one of her officemates was interfering with Ms. Dixon-Tribou's ability to run the air conditioning unit. DSOF ¶ 36. In response, Corey Vail (Ms. Dixon-Tribou's supervisor at the time) interceded and informed Ms. Dixon-Tribou's officemates that the air conditioning unit needed to be on and to remain unobstructed. DSOF ¶ 37.

Around this same time, Mr. Vail began to notice that Ms. Dixon-Tribou was not as productive as her coworkers. DSOF ¶ 42; Decl. of Corey Vail ¶ 4 (ECF No. 57-3). He observed that she routinely got less work done than her colleagues, even though she regularly requested approval to work overtime. DSOF ¶ 42. Mr. Vail also observed that Ms. Dixon-Tribou was regularly tardy and that she often left her work

station for lengthy periods of time during the day without notifying him of her whereabouts. DSOF ¶ 43.

Mr. Vail requested a formal audit of Ms. Dixon-Tribou's computer and internet usage for all of her work hours (including overtime) for the period of September 28, 2015, through October 27, 2015. DSOF ¶¶ 44–45. This audit revealed that Ms. Dixon-Tribou visited social media and shopping websites on her work computer on hundreds of occasions during her work hours, including when she was working overtime. DSOF ¶ 46. Based on this information, in late November of 2015, Mr. Cochran and Mr. Vail concluded that Ms. Dixon-Tribou had violated VA Directive 6001 (Limited Personal Use of Government Equipment Directive) and proposed a five-day suspension without pay. DSOF ¶ 47; Nov. 23, 2015, Letter from Corey Vail (ECF No. 56-5, PageID #s 1827–28). In late December, Ryan Lilly, the Director of Togus, sustained the proposed suspension, although he reduced it to three days. DSOF ¶ 48; Dec. 22, 2015, Letter from Ryan Lilly (ECF No. 56-9, PageID #s 2043–44).

In the midst of this controversy over Ms. Dixon-Tribou's computer usage, in late 2015 and early 2016, Mr. Vail continued to observe that Ms. Dixon-Tribou had issues with tardiness and with staying on task while at work. DSOF ¶ 50. Although her productivity increased after she returned from her suspension in early January of 2016, her workload was only about one-quarter of the size of that of one of her colleagues. DSOF ¶ 69.

Ms. Dixon-Tribou continued to complain about the temperature of her workspace into early 2016, so Mr. Vail and Mr. Cochran worked to identify an

alternative workspace that was large enough to accommodate an air conditioning unit that did not directly blow on her, ultimately identifying a suitable office space ("**Room 313**"). DSOF ¶¶ 56–57. Ms. Dixon-Tribou moved to Room 313 in March of 2016, although she did not use the air conditioning in that room after her supervisor yelled at her for opening a window to let in some cooler air. DSOF ¶¶ 58–59.

On March 4, 2016, Dr. Muscat submitted a Written Confirmation of Request for Accommodation to Mr. Cochran, on behalf of Ms. Dixon-Tribou, advising that he was recommending that Ms. Dixon-Tribou be permitted to telework to allow her to take her medications (which prevented her from driving) as needed and to assist her in being able to control the temperature in her workspace. DSOF ¶ 60; PSOF ¶ 66. Mr. Cochran consulted with Dr. Ray Lash in the VA's Occupational Health Division about this request. DSOF ¶ 62; PSOF ¶ 30. In response, Dr. Lash recommended "a trial of strict home temperature control" but did not specify how many days he thought Ms. Dixon-Tribou should be permitted to telework. DSOF ¶ 62; PSOF ¶ 31; Mar. 23, 2016, Email from Ray Lash (ECF No. 55-14, PageID # 1258). Ultimately, Mr. Cochran and Dr. Lash decided to allow Ms. Dixon-Tribou to telework two days per week, based on her symptoms, on a six-month trial basis.[4] DSOF ¶ 63; Decl. of Dustin Cochran ¶ 23 (ECF No. 57-2). As a result, on March 28, 2016, the VA authorized Ms. Dixon-Tribou to work from home two days per week as needed and

---

[4]     As I explained earlier, the Plaintiff denies a number of facts without supporting her denial with a citation to the record. *See supra* note 2. In the case of DSOF ¶ 63, the Plaintiff purportedly denies this fact and offers citations to the Record. However, her denial mostly qualifies DSOF ¶ 63 rather than denies it, and her cited sources do not support her denial.

also agreed to provide her with a new office to fit her needs for the days when she was working onsite at Togus. DSOF ¶ 64; PSOF ¶ 67. By late April of 2016, the VA had provided Ms. Dixon-Tribou with the technology she needed to telework and had moved her to a new, private office in a new building ("**Quarters 32**") where she had sole control over a window air conditioning unit. DSOF ¶¶ 67–68; PSOF ¶ 68.[5]

After Ms. Dixon-Tribou was moved to Quarters 32 and began teleworking twice per week, Mr. Vail increased Ms. Dixon-Tribou's workload to approximately one-third to one-half of the workload of other Community Care Department employees in order to more closely align her workload with that of her coworkers. DSOF ¶ 70. However, by July 7, 2016, it became clear that she was not keeping up with her increased workload and that she was making mistakes in her work, despite being counseled repeatedly by Mr. Vail. DSOF ¶¶ 71–72. Ms. Dixon-Tribou complained that her increased workload was unreasonably high, particularly because the temperature in her office interfered with her ability to work. Dixon-Tribou Statement to EEO Investigator ("**EEO Statement**") 16–17 (ECF No. 55-13, PageID #s 1105–06). And she believes that Mr. Vail was setting her up for termination. EEO Statement 15.

Around July of 2016, Mr. Vail reduced Ms. Dixon-Tribou's workload to approximately one-quarter of the workload of her colleagues and asked one of Ms. Dixon-Tribou's coworkers to work with her to ensure she understood certain aspects

---

[5]   As I mentioned earlier, the Plaintiff both denies and qualifies DSOF ¶ 68. *See supra* note 2. One portion of DSOF ¶ 68 that she clearly denies is that she had sole control over the air conditioning unit, but she fails to provide record support for that proposition. That denial is thus improper, and this fact is deemed admitted for purposes of the Defendant's motion.

of her job. DSOF ¶¶ 71, 73–74. Ms. Dixon-Tribou not only continued to struggle to complete her work in a timely manner, but she continued to request permission to work in excess of forty hours (and thereby earn comp time) to complete some of her work. DSOF ¶¶ 75–76.

Around this same time, Ms. Dixon-Tribou continued to be dissatisfied with the temperature in her office, and she complained that the air conditioner in her office in Quarters 32 was not sufficiently cooling the room. DSOF ¶ 77. In August of 2016, Mr. Vail checked the temperature in Ms. Dixon-Tribou's office on several days—including times when the outside temperature exceeded ninety degrees—and found that the air conditioner adequately cooled her office to below seventy-two degrees, even when her office door was open. DSOF ¶ 78.

Also in late summer of 2016, Mr. Vail began to receive reports from VA employees that they had seen Ms. Dixon-Tribou in the Togus community garden during the workday. DSOF ¶¶ 79, 80; PSOF ¶ 69. For example, one of Ms. Dixon-Tribou's coworkers reported that all summer long Ms. Dixon-Tribou would walk past her desk on the way to the garden at least twice per week and would return anywhere from one to three hours later. DSOF ¶ 82. On three separate days, during working hours, that same coworker reported driving past the garden and seeing Ms. Dixon-Tribou, only to drive past the garden two hours later and again spot Ms. Dixon-Tribou in the garden. DSOF ¶ 82. Another colleague reported stopping by Ms. Dixon-Tribou's office and finding it empty, and when he returned to her office an hour later, she told him she had gone to get her tomatoes from the garden and to bring them home. DSOF

¶ 81. Mr. Vail also noticed that Ms. Dixon-Tribou would sometimes appear as "away" or "inactive" for several hours on the VA's internal chat application even when there was no apparent work-related reason for her to be away from her computer for such a long period of time. DSOF ¶ 83.

As a result of these peculiarities, Mr. Vail requested an audit of Ms. Dixon-Tribou's computer login and logout records between April 29, 2016, and September 8, 2016. DSOF ¶ 84. Mr. Cochran analyzed these records and, after comparing them to Ms. Dixon-Tribou's attendance records, found that while a typical employee is in an "away" status for approximately one hour per day, Ms. Dixon-Tribou's login/logout records showed her as being "away" for more than two hours on twenty-eight separate days. DSOF ¶¶ 86–87.

Based on the results of this computer audit and the reports from Ms. Dixon-Tribou's coworkers, Mr. Vail and Mr. Cochran decided to propose Ms. Dixon-Tribou's termination. DSOF ¶ 89. And on September 21, 2016, Mr. Vail wrote to Ms. Dixon-Tribou notifying her that he was proposing her removal from federal service for "fail[ing] to put forth an honest effort in the performance of [her] duties." DSOF ¶ 90; PSOF ¶ 70; Sept. 21, 2016, Corey Vail Letter (ECF No. 56-8, PageID #s 1892).

Six days after Mr. Vail wrote this letter proposing that Ms. Dixon-Tribou be terminated, Ms. Dixon-Tribou submitted a third reasonable accommodation request, this time requesting that she be permitted to telework full time. PSOF ¶ 71. On October 13, 2016, Togus's Director of Human Resources (Jonathan Meserve) acknowledged receipt of this request and told Ms. Dixon-Tribou that they would meet

10

to discuss this request. PSOF ¶ 72. He also advised her that, while it did not appear to him that her request was time-sensitive, she should notify him immediately if that was not the case. PSOF ¶ 73. On October 26, 2016, Ms. Dixon-Tribou met with one of Mr. Meserve's subordinates to discuss her reasonable accommodation request. PSOF ¶ 74. And on October 31, 2016, Mr. Meserve proposed moving Ms. Dixon-Tribou to an office with an air conditioning unit that did not blow directly on her. PSOF ¶ 75.

Meanwhile, while this discussion about Ms. Dixon-Tribou's third reasonable accommodation request was ongoing, Alfred Montoya, the Director of the VA White River Junction Health Care System in Vermont, was assigned to review the bases for Ms. Dixon-Tribou's proposed removal, as well as written and oral replies that Ms. Dixon-Tribou had provided.[6] DSOF ¶¶ 93–95. In evaluating Ms. Dixon-Tribou's proposed removal, Mr. Montoya considered the reasons that Mr. Vail had provided, Ms. Dixon-Tribou's years of service, her past work record, the nature and seriousness of the charges against her, her past disciplinary record, her medical condition, and the accommodations that the VA had made for her. DSOF ¶¶ 98–100. Ms. Dixon-Tribou told Mr. Montoya that she did not believe her accommodations had been consistently met, but he did not find her version of events to be credible, especially in light of photographs that Mr. Vail provided showing that the temperature in her office was below seventy-one on multiple days. DSOF ¶ 101. Mr. Montoya also did not find

---

[6]     This responsibility would ordinarily have fallen to Ryan Lilly, the Director of the Togus VA Medical Center ("**Togus**"), but he recused himself as a result of having previously discussed aspects of Ms. Dixon-Tribou's case with other Togus employees. DSOF ¶¶ 91–92. Mr. Montoya did not discuss Ms. Dixon-Tribou's case with Mr. Lilly at any point. DSOF ¶ 103.

Ms. Dixon-Tribou's explanations for her lengthy away periods to be credible. DSOF ¶ 102. Mr. Montoya ultimately agreed with the proposed removal, and, on November 3, 2016, he issued a final written notification of removal. DSOF ¶¶ 97–98; PSOF ¶ 76.

## II.    The EEO Investigation and OPM Decision

On March 17, 2016, Ms. Dixon-Tribou initiated contact with the VA Office of Resolution Management ("**ORM**"). DSOF ¶ 61; ORM Report of Investigation (ECF Nos. 55-13, 55-14). In June of 2016, she filed a Complaint of Employee Discrimination alleging a hostile work environment due to her disability as evidenced by five actions taken against her ("events," in the parlance of ORM): (1) the VA's alleged failure— and continuing failure—to comply with Ms. Dixon-Tribou's approved reasonable accommodation, (2) the December 2015 suspension, (3) the denial of the March 2016 request for full-time telework, (4) Ms. Dixon-Tribou's relocation to Room 313 in March of 2016, and (5) the increase in Ms. Dixon-Tribou's workload in the late spring/early summer of 2016. PSOF ¶ 36; Aug. 22, 2016, ORM Notice of Partial Acceptance ("**Aug. 2016 ORM Notice**") 1–2 (ECF No. 55-13, PageID #s 1047–48). ORM decided that Ms. Dixon-Tribou's claims of a hostile work environment were inadequate because she did not allege any conduct that was sufficiently severe or pervasive to constitute a hostile work environment. PSOF ¶ 85; Aug. 2016 ORM Notice 2. However, ORM accepted events one, three, and five "for investigation as independently actionable claims." PSOF ¶ 83; Aug. 2016 ORM Notice 2.[7]

---

[7]    The second event—the December 2015 suspension—was dismissed for failure to comply with regulatory time limits because Ms. Dixon-Tribou did not contact an EEO counselor within forty-five days of its occurrence. PSOF ¶ 84; Aug. 22, 2016, VA Office of Resolution Management ("**ORM**") Notice

In January of 2017, counsel for Ms. Dixon-Tribou contacted ORM about amending the complaint that she had previously filed. PSOF ¶ 88; Feb. 24, 2017, ORM Notice of Amendment Decision ("**Feb. 2017 ORM Notice**") 2 (ECF No. 55-11, PageID # 635). Specifically, counsel sought to add claims of disability discrimination and reprisal based on (1) Ms. Dixon-Tribou's reassignment to the Community Care Department in late 2014, (2) her non-promotion to Nurse IV in early 2014, and (3) her November 2016 termination. PSOF ¶ 88; Feb. 2017 ORM Notice 2. ORM dismissed the first claim, finding that it was untimely because Ms. Dixon-Tribou had not contacted an EEO counselor within forty-five days of her reassignment. PSOF ¶ 90; Feb. 2017 ORM Notice 2–3. And ORM denied the request to amend the original complaint to add the second and third claims, determining that these claims were not sufficiently related to the original claims to qualify as amendments. PSOF ¶ 91; Feb. 2017 ORM Notice 3. As a result of this denial, Ms. Dixon-Tribou filed a second Complaint of Employee Discrimination containing those two claims. PSOF ¶ 95.

On January 26, 2017, Ms. Dixon-Tribou filed an application for disability retirement with the Office of Personnel Management ("**OPM**") under the Federal Employee Retirement System ("**FERS**") in which she claimed that she was removed from her position because of her disability. PSOF ¶ 44. On May 14, 2019, OPM decided that Ms. Dixon-Tribou had "submitted sufficient documentation to establish [her] entitlement to disability retirement benefits under the" FERS and granted her

---

of Partial Acceptance 1–2 (ECF No. 55-13, PageID #s 1047–48). It is not clear why ORM declined to proceed with the fourth event as an independently actionable claim.

"a disability retirement benefit," which was formally approved a week later. Pl.'s Ex. A[8] (ECF No. 64, PageID #s 2859–61); May 21, 2019, Letter from Angerlia Johnson (ECF No. 56-21, PageID #s 2650–53).

## PROCEDURAL BACKGROUND

On November 8, 2019, the Plaintiff filed a Complaint[9] alleging disability discrimination (Count One), a hostile work environment (Count Two), Title VII retaliation (Count Three), and "Collateral attack and abuse of authority" (Count Four). Compl. 5–7 (ECF No. 1). On August 2, 2021, I held a Local Rule 56(h) Pre-Filing Conference in this case. Local 56(h) Pre-Filing Conference Tr. ("**56(h) Conference Tr.**") (ECF No. 50). At that conference, Plaintiff's counsel clarified that Count Four was a failure to accommodate claim under the Rehabilitation Act. 56(h) Conference Tr. 7:23–8:4. Counsel also clarified (twice) that the only adverse actions

---

[8]     The Plaintiff attaches seven exhibits to her motion in violation of my 56(h) Order and then cites directly to those exhibits. My order required the parties to file a stipulated summary judgment record that was to "consist of the universe of documents that any party may cite to in its motion or statement of facts." 56(h) Order ¶ 4. It is not clear to me whether the Plaintiff's exhibits are a part of the voluminous Record that was previously filed in this case, and it is not my responsibility to scour the Record to try to determine whether they are. *Cf. Ríos-Jiménez v. Principi*, 520 F.3d 31, 38–39 (1st Cir. 2008) (noting that the District of Puerto Rico's substantially similar Local Rule 56 was "intended to prevent parties from shifting to the district court the burden of sifting through the inevitable mountain of information generated by discovery in search of relevant material"). If they were part of the Record, they should have been cited with ECF document and page ID numbers. If they were not part of the Record, the Plaintiff should have supplemented the Record to include them. *See* 56(h) Order ¶ 4 ("If during the motion practice any party determines that it needs to supplement the record, it may file a supplemental record, but shall not duplicate any record material already on the docket."). The process of combing through the Record to see if it supports a fact is tedious. The requirement of citation to ECF documents and page ID numbers may seem overly technical, but it allows me to easily access the support for any particular fact. Nevertheless, in an effort to give the Plaintiff every benefit of every doubt, I consider these attachments to be part of the Record that I may properly consider in evaluating the motions before me.

[9]     The Complaint was originally filed in the District of Massachusetts but was subsequently transferred to this Court. PSOF ¶¶ 56, 106.

underlying the claim of disability discrimination in Count One were Ms. Dixon-Tribou's nonpromotion to Nurse IV, the increase in her workload in late spring/early summer of 2016, and her termination. 56(h) Conference Tr. 8:5–25; 9:14–17.

On February 11, 2022, the Defendant filed a motion for summary judgment as to all of the Plaintiff's claims. In his motion, the Defendant's principal arguments are as follows: (1) the VA had a legitimate, nondiscriminatory reason for each of the three adverse actions taken against Ms. Dixon-Tribou (her nonpromotion, her increase in workload, and her termination);[10] (2) with respect to her failure to accommodate claim, the Plaintiff cannot prove a lack of reasonable accommodation; and (3) the conduct the Plaintiff experienced was not sufficiently severe and pervasive to constitute a hostile work environment. Def.'s Mot. 18–27. The Plaintiff does not respond to most of these substantive arguments and instead mostly focuses on her contention that the "Defendant asks this Court to relitigate the Office of Personnel Management ("OPM") [sic] final and conclusive determination that Plaintiff was entitled to a disability retirement." Pl.'s Obj. & Opp'n to Def.'s Mot. for Summ. J. & Undisputed of [sic] Facts ("**Pl.'s Opp'n**") 3–4 (ECF No. 76). The Plaintiff also takes issue with the process involved in granting Ms. Dixon-Tribou reasonable accommodations and in her ultimate termination. Pl.'s Opp'n 5–7.

---

[10]     The Defendant makes other arguments as to why the Plaintiff's disability discrimination and retaliation claims fail (e.g., a lack of causal nexus between her disability and the adverse action), but the Defendant focuses primarily on the legitimate, nondiscriminatory reasons, *see* Def.'s Mot. for Summ. J. ("**Def.'s Mot.**") 18–21 (ECF No. 61), and I do the same.

On February 18, 2022, the Plaintiff filed a motion for summary judgment as to the issue of liability.[11] In the first instance, the Plaintiff argues that I lack jurisdiction to second-guess any of the factual findings made by OPM in making its administrative decision and that res judicata also precludes revisiting those findings. Pl.'s Mot. 8–10. The Plaintiff then goes on to make her merits arguments, contending that the undisputed facts support summary judgment in her favor on each of her claims. Pl.'s Mot. 10–19.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party . . . .' " *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (quoting *Ellis v. Fid. Mgmt.*

---

[11]    The Plaintiff originally filed her motion on February 11, 2022. Because of the large number of violations of Local Rule 56 and my 56(h) Order (in particular, the failure to file a statement of facts), I struck this motion and ordered that a new motion be filed in compliance with Local Rule 56(h) and my 56(h) Order. Order (ECF No. 63). The Plaintiff re-filed her motion, this time including a statement of facts, although, as the Defendant points out, her motion and her statement of facts still violate Local Rule 56 in multiple ways. As a remedy, the Defendant requests that the Plaintiff's motion again be stricken. Def.'s Opposing Statement of Undisputed Material Facts & Add'l Statement of Undisputed Material Facts 2 (ECF No. 73).

It is troubling that Plaintiff's counsel cannot seem to follow the local rules and my orders. Counsel has created a great deal of additional work for the Defendant and for the Court. Nevertheless, as I have explained elsewhere in this Order, the consequences for the deficiencies in Plaintiff's counsel's filings are felt most harshly by the Plaintiff. She, via her counsel, has failed to respond appropriately to much of the DSOF and the Defendant's opposing statement of facts, thereby conceding many crucial facts. And she, via her counsel, has made little if any effort to respond to most of the Defendant's arguments, thereby forfeiting her right to do so. These failures are sanction enough. I see no reason to further prolong the summary judgment process—which began close to a year ago—by ordering Plaintiff's counsel to redo their work again. The Defendant's request to strike the Plaintiff's motion is denied.

16

*Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018)). "[A]nd a fact is 'material' if it 'has the potential of affecting the outcome of the case.' " *Id.* (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)). The moving party bears the initial burden of showing that no such dispute exists, and the nonmoving party must then respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which it has the burden of proof." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (internal quotation marks omitted).

In reviewing a motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021). But I am "not obliged either 'to draw unreasonable inferences or credit bald assertions or empty conclusions.' " *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)); *see also Barros-Villahermosa v. United States*, 642 F.3d 56, 58 (1st Cir. 2011) ("Mere allegations, or conjecture unsupported in the record, are insufficient." (internal quotation marks omitted)).

"Cross motions for summary judgment do not change the standard." *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (quoting *Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007)). When parties file cross-motions for summary judgment, each "must be decided on its own merits." *P.R. Am. Ins. Co. v. Rivera-Vázquez*, 603 F.3d 125, 133

(1st Cir. 2010). The motions should ordinarily be considered at the same time, and the same standards should apply to each. *Id.*

The Plaintiff argues that a different standard applies here than the one that I have just outlined. She contends that I must review "the Administrative Record . . . of Plaintiff's adverse removal under the Administrative Procedure Act ("APA")" rather than the normal summary judgment standard "because of the limited role of a court in reviewing the administrative record under the APA." Pl.'s Mot. 7–8. But the Plaintiff has not petitioned for a review of any agency action or filed any claims under the APA. Rather, she has brought claims under the Rehabilitation Act and potentially Title VII. Compl. 5–8. The APA thus has no applicability here.[12] The standard summary judgment parameters apply.

## ANALYSIS

## I.  **Jurisdictional Argument**

I begin with the Plaintiff's primary argument that I lack jurisdiction to review any of the factual findings of OPM. After the Plaintiff was terminated, she requested a "disability retirement" from OPM. PSOF ¶ 44. At first, she was denied, but OPM later changed its position and granted her the "disability retirement." PSOF ¶¶ 47,

---

[12]   The Plaintiff cites to two district court cases in the District of Columbia to support her contention that I must review her claims under the Administrative Procedure Act ("**APA**"). Pl.'s Mem. in Supp. of Mot. for Summ. J. 8 n.32 (ECF No. 64). But in those cases, the plaintiffs brought claims under the APA. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 79 (D.D.C. 2006) ("Plaintiffs . . . alleg[ed] that [the National Park Service] failed to consider environmental impacts from oil and gas operators' surface activities . . . in violation of the . . . Administrative Procedure Act."); *Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 125 (D.D.C. 2010) ("The plaintiffs . . . allege that the Secretary violated the Administrative Procedure Act." (footnote omitted)). Those cases have no applicability here.

50; Pl.'s Ex. A; May 21, 2019, Letter from Angerlia Johnson. Under federal regulations, a federal employee seeking a "disability annuity" under the FERS must meet certain requirements, including two that are relevant here. First, the applicant must "have become disabled because of a medical condition, resulting in a deficiency in performance, conduct, or attendance, or if there is no such deficiency, the disabling medical condition must be incompatible with either useful and efficient service or retention in the position." 5 C.F.R. § 844.103(a)(2). Second, the "[a]ccommodation of the disabling medical condition in the position held must be unreasonable." *Id.* §844.103(a)(4). Because she was granted disability retirement, the Plaintiff contends that I must accept OPM's "determination" that the "Plaintiff was not reasonably accommodated in the position from which she was removed." Pl.'s Mot. 9. The Plaintiff further argues that because OPM's decision is "final and conclusive and not reviewable by this Court[,][13] . . . there are no issues as to material fact reviewable by this Court and [she] is entitled to summary judgment as a matter of law." Pl.'s Mot. 9–10. The Plaintiff also invokes the doctrines of res judicata and issue preclusion

---

[13]     The Plaintiff repeatedly cites to 5 U.S.C. § 8347 to support her argument that I cannot review the decision of the Office of Personnel Management ("**OPM**"). Pl.'s Opp'n 4 n.11; DSOF ¶¶ 49, 63; Pl.'s Mot. 2 n.6, 9, 10 n.37. That statute applies to disability determinations under the Civil Service Retirement System, not under the FERS. *See Anthony v. Off. of Pers. Mgmt.*, 58 F.3d 620, 624–25 (Fed. Cir. 1995). A nearly-identical statute exists with respect to the FERS, 5 U.S.C. § 8461, *see id.*, and I address the Plaintiff's argument in the context of that statute.

     Section 8461 grants OPM the right to "determine questions of disability and dependency arising under the provisions of this chapter" and says that OPM's decisions "concerning these matters are final and conclusive and are not subject to review." 5 U.S.C. § 8461(d). "[T]his chapter" refers to the chapter in which § 8461 is housed, Chapter 84, which is entitled "Federal Employees' Retirement System." As I understand the language in § 8461, I cannot review OPM's decisions "arising under" that Federal Employees' Retirement System chapter. But the Plaintiff has not asked me to review the correctness of OPM's FERS decision (which is the decision § 8461(d) applies to), so I do not understand what applicability this statute could have to this case.

as an alternative basis as to why OPM's "determination" must be accepted in this Court as controlling on her disability claims. Pl.'s Mot. 10.

The Plaintiff's argument is based on the faulty premise that "OPM determined Plaintiff was not reasonably accommodated in the position from which she was removed." Pl.'s Mot. 9. The Plaintiff offers no record support for that claim. *See* PSOF ¶ 51. The only thing that the Plaintiff cites to in order to support that "determination" is OPM's May 21, 2019, letter informing the Plaintiff that her application for disability retirement had been approved. PSOF ¶ 49 (citing ECF No. 56-21). But that letter contains no such "determination" and no factual findings or legal conclusions of any kind. Even if I were to conclude that OPM would have had to have found that the regulatory requirements were met before it approved the Plaintiff's application, the regulation requires that "[a]ccommodation of the disabling medical condition in the position held . . . be unreasonable." 5 C.F.R. § 844.103(a)(4). The Plaintiff twists this to say that the Plaintiff "was not reasonably accommodated," but that is not a determination that OPM would necessarily have had to make.[14] And the Plaintiff has offered no evidence that OPM did make that decision.

With respect to the Plaintiff's res judicata and issue preclusion arguments, she acknowledges that agency determinations only have preclusive effect where an "administrative agency is acting in a judicial capacity." Pl.'s Mot. 10 n.39 (citing *Ríos-*

---

[14]    For example, OPM could have concluded that the VA did provide the Plaintiff with reasonable accommodations (i.e., air conditioning, a reduced workload, differing productivity requirements) but that she was unable to perform the essential functions of her job because of her disability, even with those accommodations. OPM could also have concluded that it was not reasonable to expect the VA to provide the full-time remote work accommodation under the circumstances.

*Piñeiro v. United States*, 713 F.3d 688, 690 (1st Cir. 2013)). But, as the Defendant notes, the Plaintiff points to no evidence in the Record that OPM acted in such a capacity. Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. 17 (ECF No. 74). The Plaintiff claims, again without record support:

> To make [the disability retirement] determination OPM had to first address the issue of whether the Plaintiff's alleged work discrepancies were due to failure to accommodate her MS or intentional. In order to make the correct decision OPM was required to base its determination upon the probative value of all of the evidence, taking into account: (1) objective clinical findings; (2) diagnoses and expert medical opinions; and (3) subjective evidence of pain and disability together with (4) all evidence relating to the effect of the appellant's condition upon his or her ability to perform in the grade or class of position last occupied.

Pl.'s Mot. 9. Other than the Plaintiff's ipse dixit, the Plaintiff points to nothing in the Record that sheds any light on the process OPM used to make its determination.

Further, the Plaintiff makes no effort to go through the analysis to establish that OPM's decision should have preclusive effect. *Compare* Pl.'s Mot. 10, *with Ríos-Piñeiro*, 713 F.3d at 692 (explaining the factors to be examined in evaluating the preclusive effect of an agency decision). As a result, the Plaintiff has not met her burden to show that res judicata applies here. *See Puerto Ricans for P.R. Party v. Dalmau*, 544 F.3d 58, 70 (1st Cir. 2008) ("Once properly raised, a party asserting preclusion must carry the burden of establishing all necessary elements." (quoting 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4405, at 83 (2d ed. 2002))). Accordingly, the Plaintiff's motion for summary judgment on these grounds is denied.

Before turning to the merits of the Defendant's motion for summary judgment, I note that, in disputing summary judgment, the Plaintiff partially relies on the same

arguments with respect to OPM's disability determination that I have just addressed. Pl.'s Opp'n 3–4. For the same reasons that these arguments are insufficient to support summary judgment in the Plaintiff's favor, they are also insufficient to stave off summary judgment for the Defendant. Once the Defendant has met his initial burden showing that there is no genuine dispute of material fact and that he is entitled to judgment in his favor (as I ultimately conclude he has), the Plaintiff is obligated to "come forward with some evidence showing a genuine dispute of material fact." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013). I need not credit "unreasonable inferences," "bald assertions," or "empty conclusions." *Theriault*, 890 F.3d at 348 (internal quotation marks omitted). Because the Plaintiff fails to point to any evidence in the Record that supports her contentions about OPM's determination, she is unable to rely on this determination in opposing summary judgment.

## II.   Disability Discrimination (Count One)

The Plaintiff has alleged that she was discriminated against on the basis of her disability under the Rehabilitation Act.[15] These claims are analyzed under "the well-known burden-shifting framework delineated by the Supreme Court in" *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Ríos-Jiménez v. Principi*, 520 F.3d 31, 40 (1st Cir. 2008). Pursuant to that framework, the plaintiff has the initial burden of proving that "1) she was disabled within the meaning of the statute; 2) she was

---

[15]   The Plaintiff has not specified which section of the Rehabilitation Act she has brought her claims under, but the Defendant surmises that, based on the Plaintiff's requests for a jury trial and for compensatory damages, she is proceeding under Section 501. Def.'s Mot. 14 n.5. The Plaintiff does not challenge this conclusion, and I have no reason to doubt it. I thus proceed on the same assumption.

22

qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and 3) the employer took adverse action against her because of the disability." *Id.* at 40–41. Once the plaintiff establishes this prima facie case, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision and to produce credible evidence to show that the reason advanced was the real reason." *Id.* at 41. "If the defendant is able to offer such a reason, the burden then shifts back to [the plaintiff] to establish that the proffered reason is pretext intended to conceal discriminatory intent." *Id.*

The Defendant does not dispute that the Plaintiff had a qualifying disability or that she was qualified to perform the essential functions of her job. Def.'s Mot. 17. While the Defendant disputes that the Plaintiff cannot prove a causal link between her disability and some of the adverse actions taken against her, the Defendant spends most of his briefing arguing that he had a legitimate, non-discriminatory reason for each adverse action taken. Def.'s Mot. 17–20. I assume that the Plaintiff is able to make out a prima facie case, and I focus only on the legitimate, non-discriminatory reasons offered by the Defendant for the three adverse actions—non-promotion, increase in workload, and termination—asserted by the Plaintiff.[16]

---

[16]    The Plaintiff makes little effort to argue that any of the Defendant's proffered reasons are pretextual. She makes no pretext argument in her response to the Defendant's motion, *see generally* Pl.'s Opp'n, and in her own motion, while she pays lip service to the idea of pretext, she offers no evidence to indicate that any of the Defendant's legitimate, non-discriminatory reasons are pretextual, *see* Pl.'s Mot. 1, 2, 12.

### A.    Non-Promotion to Nurse IV

Based on the undisputed evidence, Nurse IV positions are not easily attainable. At the relevant time, there were only approximately five Nurse IV positions at Togus. The Nurse IV classification is based on the scope and complexity of a particular position rather than just an individual employee's qualifications. The VA conducted a review of the Plaintiff for reclassification to a Nurse IV position, but it concluded that, although the Plaintiff had the requisite education and experience, her quality management position did not have the scope and complexity to support a Nurse IV position. The decision not to reclassify Ms. Dixon-Tribou as a Nurse IV was therefore not based on an evaluation of Ms. Dixon-Tribou's credentials but only based on the duties she held in her particular role.

The Plaintiff points to no evidence to indicate that this nonpromotion decision was erroneous in any way. For example, she does not explain why she believes her position warranted a promotion to Nurse IV. She does not try to compare her position at the time to other Nurse IV positions. Nor does she seek to offer any evidence about the people who have been promoted to Nurse IV at Togus, or the positions that they occupied. Based on this dearth of evidence of pretext, no reasonable juror could conclude on these facts that the Defendant's failure to promote Ms. Dixon-Tribou was motivated by discriminatory animus.

Because the Plaintiff has failed to offer any evidence to indicate that the Defendant's nonpromotion decision was pretextual, the Defendant is entitled to summary judgment. That is, the Defendant has met his burden of explaining why summary judgment is warranted, and the Plaintiff has not introduced any evidence

to call into question the Defendant's reasoning. *See Jakobiec*, 711 F.3d at 226 ("Faced with a defendant's motion for summary judgment, a plaintiff must come forward with some evidence showing a genuine dispute of material fact if he wants to get in front of a jury.").

### B.    May 2016 Increase in Workload

Similarly, the Plaintiff offers no reason to question the Defendant's proffered reason for why Mr. Vail increased her workload. The undisputed evidence shows that Ms. Dixon-Tribou had a significantly lighter workload than her colleagues both before and after the increase. It is a legitimate, nondiscriminatory reason to increase an employee's workload to bring it more in line with others in the workplace. And the Plaintiff offers no reason to question this explanation. Moreover, within a few months, Mr. Vail reduced Ms. Dixon-Tribou's workload to around one-quarter of that of her colleagues. The Plaintiff offers no explanation for why, if the VA acted with discriminatory animus in increasing Ms. Dixon-Tribou's workload (to an amount that was still below that of her colleagues), it subsequently decreased it.

The Plaintiff alludes to the idea that she was unable to complete her work because of her disability and the Defendant's purportedly inadequate accommodation for it. Pl.'s Mot. 11 (referring to her "inability to do her work in an unaccommodated position"), 14 (noting that she "was removed for the alleged work discrepancies caused by her disabling MS"). While it may exist in the voluminous record that was filed, the Plaintiff has not put forward any properly supported statements of fact to support her contentions that she was unable to complete her work because of her disability or that she requested that her workload be further reduced as an accommodation for

25

her disability. Nor has the Plaintiff, with one exception,[17] properly refuted any of the Defendant's properly supported statements of fact with respect to her diminished workload. The parties are required to support material facts and any opposition to the opposing party's facts with "a citation to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56 (f). "The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." D. Me. Loc. R. 56(f); *see Ríos-Jiménez*, 520 F.3d at 38–39.

Finally, it is also significant that the VA has never—not in its initial termination decision or in this litigation—justified Ms. Dixon-Tribou's termination based on her inability to complete her work. And the Plaintiff never argues, or points to any evidence in the Record, to the contrary. The VA based its termination decision on Ms. Dixon-Tribou's failure to put forth an honest effort in the performance of her duties, not in her inability to carry a full workload. Even when viewing the facts in the light most favorable to the Plaintiff, the Plaintiff points to no evidence that the increase in her workload was motivated by discriminatory animus rather than an effort to even out the workload among Ms. Dixon-Tribou and her colleagues.

---

[17]  The only exception is with respect to DSOF ¶ 73. The Plaintiff purportedly denies this fact but actually qualifies it, contending (citing to PageID # 1106, sentences 1–5) that when Mr. Vail reduced her workload in July of 2016, he failed to consider her disability. But this qualification is in the context of Mr. Vail *reducing* her workload (from one-third of that of her colleagues to one-quarter of that of her colleagues), not increasing it. As a result, this does not support the Plaintiff's argument that the earlier workload increase was due to discriminatory animus. If anything, it refutes it.

### C.    Removal from Federal Service

The Plaintiff also contends that she was terminated as a result of her disability. But in doing so, she ignores her problematic disciplinary record, which establishes a legitimate, nondiscriminatory reason for her termination. Most acutely, the VA learned from eyewitness reports that Ms. Dixon-Tribou was spending a large amount of time in Togus's community garden during the workday. And an audit report of computer login and logout times revealed that in the summer of 2016, Ms. Dixon-Tribou was in an "away" status for more than two hours on more than twenty-eight occasions. Nor was this the first time that the VA had identified issues with Ms. Dixon-Tribou's attentiveness to her work. She had previously had issues with tardiness and with excessive use of her work computer for personal internet surfing during work hours, the latter of which had resulted in a three-day suspension.

Mr. Montoya—who had not been involved in any of the efforts to accommodate (or, in Ms. Dixon-Tribou's telling, the failures to accommodate) Ms. Dixon-Tribou's disability—looked at this disciplinary history and decided that termination was warranted. In making this decision, he considered a number of different factors, including her medical condition and the accommodations that the VA had made for her.[18]

Ms. Dixon-Tribou believes that she was fired because of her disability and that the reason that the VA has offered for her termination (her excessive time away from

---

[18]    The Plaintiff contends that Mr. Montoya's review was incomplete because "the VAMC center withheld" particular information from him. Pl.'s Opp'n 7. She does not cite to the Record for this proposition, and I do not credit it. Indeed, there is nothing in the PSOF or DSOF to lend credence to this argument.

her desk, in combination with the rest of her disciplinary history) is pretextual. But the undisputed facts prove that Ms. Dixon-Tribou was frequently engaging in non-work activities during work hours, and the Plaintiff has offered no explanation for her behavior.[19] Rather, as I have explained above, the Plaintiff failed to properly contest almost any of the Defendant's evidence related to the Plaintiff's disciplinary history, so I must take all of these undisputed facts as true. The Plaintiff has failed to identify any way in which the Defendant's decisions could be viewed as pretextual, and no reasonable juror could conclude otherwise.

The Defendant has offered legitimate, nondiscriminatory reasons for each of these three adverse actions taken against Ms. Dixon-Tribou.[20] And the Plaintiff has offered no evidence of pretext. The Defendant is entitled to summary judgment on Count One.

## III.  Retaliation (Count Three)

The Plaintiff's Complaint frames Count Three as being rooted in Title VII.[21] Compl. ¶ 45. This seems to have been an error. The Defendant surmises that the

---

[19]   According to the DSOF, Ms. Dixon-Tribou provided Mr. Montoya with an explanation for her lengthy away periods, although he did not find these explanations to be credible. The Plaintiff has not identified what these explanations were, nor is it clear to me whether they are even in the Record. As a result, those explanations are not before me.

[20]   In her opposition, the Plaintiff argues that her reassignment to the Community Care Department constituted a withdrawal of a reasonable accommodation that had previously been granted to her. Pl.'s Opp'n 6. The Plaintiff already made clear at the 56(h) Conference that she was not relying on this reassignment as an adverse action, and I take her at her word. But even if she had sought to prove that this reassignment constituted disability discrimination, such a claim would be barred due to the Plaintiff's failure to consult with an EEO counselor within forty-five days. Def.'s Reply in Supp. of His Mot. for Summ. J. 5–6 (ECF No. 80); PSOF ¶ 90; Feb. 24, 2017, ORM Notice of Amendment Decision 2–3 (ECF No. 55-11, PageID #s 635–36).

[21]   Title VII prohibits employers from discriminating against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-1(a).

Plaintiff intended to bring a retaliation claim pursuant to the Rehabilitation Act, Def.'s Loc. R. 56(h) Mem. 4 n.3 (ECF No. 47), and has proceeded accordingly, Def.'s Mot. 15–16. Indeed, the Plaintiff has not sought to disabuse the Defendant of this notion, and her briefing makes no reference to Title VII. *See generally* Pl.'s Opp'n; Pl.'s Mot. I thus proceed under the same assumption, that this is actually a retaliation claim under the Rehabilitation Act.[22]

The framework for a retaliation claim is similar to that of a discrimination claim. A plaintiff seeking to prove retaliation under the Rehabilitation Act must prove that she engaged in protected conducted, that she suffered an adverse action, and that there was a causal link between the two. *Palmquist v. Shinseki*, 689 F.3d 66, 70 (1st Cir. 2012). Then, as with a discrimination claim, the burden of production "shifts to the employer to articulate a legitimate, nonretaliatory reason for the employment decision," which the plaintiff must then prove was pretextual. *Id.*

As with the Plaintiff's disability discrimination claims, even assuming she could make out a prima facie case, the Defendant has put forward legitimate, nonretaliatory reasons for each of the allegedly adverse actions taken against her. And the Plaintiff has failed to identify any evidence of pretext. She points to nothing in the Record to call into doubt any of the Defendant's main contentions about her disciplinary history. And she offers no facts on which any reasonable juror could rely

---

[22]    Even if the Plaintiff had intended to proceed under Title VII, it would make no difference. As I explain throughout this Order, the Defendant has offered legitimate, nondiscriminatory reasons for each of the allegedly adverse acts taken against Ms. Dixon-Tribou. And the Plaintiff has failed to identify any evidence of pretext. The same analysis would govern for a Title VII claim, *see Paul v. Murphy*, 948 F.3d 42, 49 (1st Cir. 2020), and I would come to the same conclusion.

to make a finding of pretext. The Defendant is entitled to summary judgment on Count Three.

## IV.  Hostile Work Environment (Count Two)

To succeed on her hostile work environment claim, the Plaintiff "must show that her 'workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.' " *Ríos-Jiménez*, 520 F.3d at 43 (quoting *Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006)). The Defendant contends (and the Plaintiff does not dispute) that the Plaintiff's hostile work environment claim was based on the following events: (1) the VA's audits of her computer and the resulting discipline, (2) the posting of demeaning signs by her coworkers upon her return from her suspension, (3) Mr. Vail's and Mr. Cochran's responses to Ms. Dixon-Tribou's complaints about the temperature of her office and her coworkers' actions to interfere with her ability to control the temperature, (4) the VA's refusal to grant her requested accommodation of full-time telework, (5) the VA's slow response time in granting her original reasonable accommodation request, and (6) the VA's failure to provide her with a laptop that was adequate for her to be able to do her work. Def.'s Mot. 24.

The bar to prove a hostile work environment claim is a high one. "The challenged conduct must be 'both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the plaintiff in fact did perceive it to be so.' " *Maldonado-Cátala v. Mun. of Naranjito*, 876 F.3d 1, 10 (1st Cir. 2017) (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 27 (1st Cir. 2011)). A court

must look at "the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Id.* (quoting *Noviello v. City of Bos.*, 398 F.3d 76, 92 (1st Cir. 2005)). "The harassment also must stem from an impermissible motivation . . . ." *Id.*

I begin my analysis of the Plaintiff's hostile work environment claim by first separating out which of these six items can properly factor into this claim. Beginning with item one, because this involves legitimate discipline as a result of Ms. Dixon-Tribou's misconduct, it cannot factor into the Plaintiff's hostile work environment claim. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 262 (1st Cir. 2001) ("The ADA is not a license for insubordination at the workplace."). There is no evidence that Ms. Dixon-Tribou's suspension was motivated by discriminatory animus.[23]

Items four and five are not supported by the Record. The VA never *refused* to grant her request for full-time telework, as the Plaintiff contends. It first sought to try a six-month trial of part-time telework, as needed. Even considering the facts in the light most favorable to the Plaintiff, as I must, this was a more than reasonable approach, particularly since this request was made by an employee who already had a history of tardiness and surfing the internet during work hours, including in the more restrictive office environment. Then, although Ms. Dixon-Tribou made another

---

[23]   The Plaintiff has apparently previously contended that she was singled out for discipline for conduct that was common among VA employees. Def.'s Mot. 24. She has not put that argument before me, nor has she identified any Record evidence to support such an argument.

request for full-time telework—within days of receiving a letter notifying her that she was being considered for termination—the VA was still considering this request when Mr. Montoya sustained the proposed removal and Ms. Dixon-Tribou was terminated.[24] As for item five, this contention is frivolous. Ms. Dixon-Tribou did not complain to Mr. Cochran about the temperature of her office until July 8, 2015, and less than two weeks later, the VA approved her accommodation request. She was then moved to a new office with an air conditioning unit just a couple of weeks later.

As for item six, it strains credulity to say that a slow laptop can be a contributor to a hostile work environment. A hostile work environment claim must involve a workplace that is genuinely *hostile*—that is, one involving "behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). A slow laptop is far afield.

That leaves only items two and three—the posting of demeaning signs about Ms. Dixon-Tribou's suspension[25] and Mr. Vail's and Mr. Cochran's allegedly

---

[24]    In her opposition, the Plaintiff places a lot of weight on a statement by Mr. Cochran that Ms. Dixon-Tribou's second request for full-time telework "was not denied" and that she was fired before a decision was made. Pl.'s Opp'n 2–3, 5–6. The Plaintiff interprets this as a concession that the VA refused to consider her telework request. That is not a reasonable understanding of this statement, particularly in the context of the undisputed facts surrounding this request. Ms. Dixon-Tribou made this request after already knowing that Mr. Vail had proposed her termination. And even though the VA was considering terminating her employment, Mr. Meserve still proceeded to evaluate her request. He even told Ms. Dixon-Tribou that she should let him know if her request was time-sensitive. The Record does not show that she requested an expedited decision, and this process remained incomplete when the final decision on Mx. Dixon-Tribou's termination was made. That final decision came just over one week after Ms. Dixon-Tribou met with one of Mr. Meserve's subordinates to discuss her request. No reasonable juror could conclude that the VA failed to consider this second telework request.

[25]    The only evidence that either party points to in the Record with regard to demeaning signs comes from the Plaintiff's response to the Defendant's interrogatories. Pl.'s Resps. & Objs. to Def.'s First Interrogs. 8–9 ("**Pl.'s Resp. to Interrogs.**") (ECF No. 55-2). In identifying the events that produced the allegedly hostile work environment to which she says she was subjected, the Plaintiff stated that her coworkers put up "demeaning signs" with respect to the audit of her computer and internet usage.  Pl.'s Resp. to Interrogs. 9. The only example that she provided was a sign that said:

inadequate responses to Ms. Dixon-Tribou's complaints about how she was treated in Room 218E. In an effort to draw all inferences in the Plaintiff's favor, I take as true her contentions that she was bullied by her coworkers in Room 218E and that Mr. Vail and Mr. Cochran did not do enough to address this unkind behavior.[26] But "the federal employment discrimination laws do not establish a 'general civility code' for the workplace." *Ríos-Jiménez*, 520 F.3d at 44 (quoting *Quiles-Quiles*, 439 F.3d at 7); *cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (finding that "petty slights, minor annoyances, and simple lack of good manners" does not constitute retaliatory behavior under Title VII). As a result, I conclude that a reasonable jury could not find that the bullying that Ms. Dixon-Tribou suffered and the VA's purportedly inadequate response to it were sufficiently severe or pervasive to alter the conditions of her employment.

But even assuming that that this behavior meets that high bar, the Plaintiff's claim remains deficient. The harassment giving rise to the hostile work environment must be *the result of* some protected characteristic. *Oncale*, 523 U.S. at 80; *Maldonado-Cátala*, 876 F.3d at 10. Here, the relevant characteristic is Ms. Dixon-Tribou's disability. While Ms. Dixon-Tribou contends that her coworkers' interference with her air conditioning unit in Room 218E interfered with the accommodation that

---

"what it looks like when the boss comes in and I am on Facebook." Pl.'s Resp. to Interrogs. 9. With respect to these signs, the Plaintiff identifies no evidence that her coworkers bullied her because of her disability.

[26]    I do note, however, that the Plaintiff does not offer any evidence to dispute the Defendant's evidence that after Ms. Dixon-Tribou complained about her coworkers' behavior, Mr. Vail intervened and told them that the air conditioning unit needed to be left on and to remain unobstructed.

the VA provided to her for her disability, she offers no evidence that this interference occurred *because of* her disability (as opposed to, for example, her coworkers being cold). The Plaintiff points to no evidence that her coworkers even knew about her disability. As a result, the Plaintiff has not offered any evidence that any harassment that she suffered occurred as a result of her disability, and no reasonable juror could find to the contrary. The Defendant is entitled to summary judgment on Count Two.

## V.   Failure to Accommodate (Count Four)

A failure to accommodate claim requires a plaintiff to prove a disability, qualification to perform the essential functions of the job with or without a reasonable accommodation, and "that the employer, despite knowing about the disability, did not acquiesce to a request for a reasonable accommodation by the employee." *Ríos-Jiménez*, 520 F.3d at 41. For a failure to accommodate claim, the plaintiff must show that the requested "accommodation would have enabled her to perform the essential functions of the job" and that it "would have been reasonable in light of relevant factors such as expense, size of the employer, etc." *Id.*

The undisputed facts reveal that the VA took a number of steps to try to accommodate Ms. Dixon-Tribou's disability. Her supervisors moved her to Room 218E where she could have access to an air conditioning unit. When she was unsatisfied with that move, the VA moved her to Room 313, where she could have an air conditioning unit that did not directly blow on her. When she was unsatisfied with that accommodation, the VA decided to allow her to telework up to twice per week and also moved her to a new office where she had sole control over a window air

conditioning unit. It is undeniable that the VA made multiple, serious efforts to try to accommodate Ms. Dixon-Tribou's disability.

The Plaintiff's gripes with these accommodations appear to be twofold—that they were, at times, imperfect and that the VA never granted Ms. Dixon-Tribou's request to telework full time. Beginning with the first, I take as true the Plaintiff's contentions that, on occasion, these accommodations came up short. For example, sometimes the air conditioner did not sufficiently cool Ms. Dixon-Tribou's office. Or, at other times, other obstacles (such as discourteous coworkers) stood in the way of these accommodations. But the Plaintiff points to no authority for the idea that an employer is liable for imperfect accommodations even when making reasonable efforts to perfect them. And that premise is in tension with the idea that the accommodation process is supposed to involve negotiation between the parties to come to a solution that meets everyone's needs. *See Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 24 (1st Cir. 2004) (" '[T]he employer has at least some responsibility in determining the necessary accommodation,' since 'the regulations envision an interactive process that requires participation by both parties.' " (quoting 29 C.F.R. § 1630.2(o)(3))). Taking the supported facts in the light most favorable to the Plaintiff, I conclude that no reasonable juror could find that the VA's efforts to accommodate Ms. Dixon-Tribou's disability were legally deficient, even if, at times, they were imperfect.

Second, the Plaintiff takes umbrage at the fact that the VA never allowed her to telework full time. But this ignores all that the VA *did* do to try to accommodate

her. Ms. Dixon-Tribou's initial accommodation request in July 2015 suggested three potential solutions—that she be given an air conditioner, that she be given a laptop, or that she be permitted to telework. The VA chose the first of these options, and I do not see how the VA could be faulted for that or how any reasonable juror could find that this approach was a violation of the law. Similarly, when Ms. Dixon-Tribou provided Mr. Cochran with a letter from Dr. Muscat, that letter did not recommend a specific accommodation. It only stated that Ms. Dixon-Tribou needed "a work environment in which higher temperature [was] not a problem." An air-conditioned office space would seem to fit that bill.

It was not until the following March that Dr. Muscat recommended that Ms. Dixon-Tribou be permitted to telework. Upon receiving that recommendation, Mr. Cochran and Dr. Lash decided to allow Ms. Dixon-Tribou to telework twice per week as needed on a six-month trial basis. This was a reasonable attempt at an accommodation, particularly in light of Ms. Dixon-Tribou's historical difficulties with focusing on her work. Then, after Ms. Dixon-Tribou submitted another request to telework full time in September of 2016, the VA again considered this request and was in the process of considering it when Ms. Dixon-Tribou was terminated five weeks later. The VA cannot be faulted for failing to finish this process when its obligation to accommodate Ms. Dixon-Tribou became moot partway through.

The Plaintiff depicts as problematic the VA's failure to allow Ms. Dixon-Tribou to telework full time from the get-go, but she cites no authority in support. On the contrary, there is substantial authority showing that the accommodation process is

one that involves negotiation. *See id.* at 23 ("In some cases, a request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation."); *Yochim v. Carson*, 935 F.3d 586, 591 (7th Cir. 2019) ("This is not a case where an employee's requests for accommodations fell on deaf ears."); *cf. Reed*, 244 F.3d at 259 ("[T]he concept of reasonableness here constrains the plaintiff in what she can demand from the defendant."). It is not the case that the VA was required to allow Ms. Dixon-Tribou to telework full time the moment she requested it. *See Howard v. United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 355 (S.D.N.Y. 2015) ("The law does not require [an employer] to provide the accommodation plaintiff subjectively believes best serves his needs."), *aff'd*, 648 F. App'x 38 (2d Cir. 2016); *Davis v. Lockheed Martin Operations Support, Inc.*, 84 F. Supp. 2d 707, 713 (D. Md. 2000) ("Employers are not required to give employees with a disability *any* accommodation they request; they are only required to provide a *reasonable accommodation*."). All that the VA was required to do was to work with Ms. Dixon-Tribou to develop an accommodation that addressed her medical needs and allowed her to do her job. The undisputed facts show that the VA did just that. Considering the facts in the light most favorable to the Plaintiff, I conclude that no reasonable juror could find that the VA failed to provide for a reasonable accommodation, and the Defendant is entitled to summary judgment on Count Four.[27]

---

[27]     In her opposition, the Plaintiff makes oblique and confusing references to various other grievances that she has with how she was treated while working at the VA. For example, she objects to the process by which she was removed, "[t]he integrity of the" EEO investigation, conflicts of interest in how Togus processed reasonable accommodation requests, Togus's "compliance with the mandated

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant's motion for summary judgment (ECF No. 61) and **DENIES** the Plaintiff's motion for summary judgment (ECF No. 64).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 13th day of July, 2022.

---

EEO process," and Togus employees' familiarity with the reasonable accommodation process. Pl.'s Opp'n 7. None of these complaints relies on any evidence in the Record, and most of them are only cursorily mentioned in the Plaintiff's opposition. These arguments are forfeited due to a failure to develop them. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").